UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VICTOR PERKINS,

                Petitioner,                  **DECISION AND ORDER**
                                                  **No. 02-CV-6608(VEB)**

    -vs-

VICTOR T. HERBERT,

                Respondent.
_____

## I.      Introduction

Victor Perkins ("Perkins" or "petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court of New York State following a jury trial on one count of robbery in the first degree (N.Y. Penal Law § 160.15(4)) and two counts of criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(4)). Perkins was sentenced as a second violent felony offender to concurrent terms of incarceration, the longest of which was a determinate term of 20 years; he is currently serving his sentence. The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.      Factual Background and Procedural History

On March 31, 1998, Perkins was arraigned on Monroe County Indictment No. 1998/177. The charges stemmed from Perkins' alleged involvement, with another man, in the robbery of a store clerk at Willie's Grocery Store in the City of Rochester on February 26, 1998. The prosecution alleged that Perkins and this other man entered the store on that date at about 10:15 a.m., on the pretense of buying some merchandise. According to the statements given by the store

clerk, Claudia Cruz ("Cruz"), to the police, Perkins displayed a gun and demanded that she give him her gold jewelry and money from the cash register. Perkins and the other man then forced the clerk into the basement of the building where they ordered her to call an individual named "Hector," a drug dealer, and direct him to come to the store. The store clerk stated that when "Hector" arrived at the store, his hands, head, and feet were bound with duct tape and he was beaten by Perkins and the other man, who kept asking him, "Where is the shit [i.e., his drugs and money]?" Eventually, "Hector" informed them that it was located in the attic of his house on Avenue C. The other man left, and Perkins remained with the clerk in the basement of the store. The police responded to a report of a "suspicious condition" at the store shortly after noon and found the store clerk, who appeared to be upset, gesturing toward a male Hispanic ("Hector") who was bound with duct tape and tied with cord. The police officers also saw a man in dark clothes exiting the basement but they did not see his face. An officer stationed behind the store pursued this man, whom he later identified as Perkins. During the brief foot chase with Perkins that ensued, the officer heard a gun being discharged and a spent shell was found along Perkins' path. After he was apprehended, Perkins was brought back to the store for a show-up identification procedure. After initially stating that she was not sure about the identity of the robber, Cruz then identified Perkins as the person who had taken her gold jewelry.[1]

Once at the police station, Investigators Baccanti and McAuliffe of the read Perkins the *Miranda* warnings, which Perkins agreed to waive. HM 81-82.[2] During the interview, Perkins

---

[1]     The indictment returned against Perkins only concerned the alleged crimes committed against Cruz, the store clerk.

[2]     Citations to "HM __" refer to the transcript of the suppression and *Wade* hearing held on June 26, 1998.

made oral admissions regarding the robbery and the discharge of the gun he was carrying during the foot-chase with the police. HM 84. After Perkins stated that he had accidentally discharged the gun, Investigator Baccanti asked if he could reduce Perkins' statements to writing. HM 110. Perkins declined and informed the police that he did not want to talk to them any further. HM 110-11. The interview was terminated at that point. HM 111. The police attempted to initiate further questioning at about 7:00 p.m., but Perkins again said that he did not want to talk any more. HM 113.

Perkins was taken to booking and, while there, two more police officers, Investigators Janus and Weather, approached him. HMII 20, 22, 25-26.[3] They brought Perkins back to the police station and placed him in an interview room. About four and a half hours later, another officer, Investigator Sennet, arrived and introduce Perkins to Investigators Janus and Weather. HM II 16, 21. After Investigator Sennet left, Investigator Weather said to Perkins, "Victor, I realize that you have been–you have been read your rights and you agreed to waive them. They still stand here during the conversation we're having now and that we're going to be having over the next few minutes," to which petitioner replied, "Yeah, no problem." HMII 21.

Investigators Janus and Weather then informed Perkins that they wanted to speak with him about "what had happened earlier in the day and something else." HMII 30. The "something else" was a homicide that had occurred earlier on the day of the robbery. HMII 30-31. The police officers believed that the homicide was related to the robbery of Cruz at Willie's Grocery Store and that Perkins had relevant information concerning the homicide. HMII 31. Although

---

[3]     Citations to "HMII __" refer to the continuation of the suppression hearing held on October 19, 1998.

Investigators Janus and Weather were aware that Perkins had been issued the *Miranda* warnings earlier that night, they maintained that they did not know that Perkins had informed the other officers that he did not want to be questioned any further. HMII 27-28, 53.

Perkins then gave a statement to Investigators Janus and Weather inculpating himself in the robbery of Cruz at Willie's Grocery Store. With Perkins' consent, the officers reduced the statement to writing. HMII 24-25, 47-48; *see also* Respondent's Exhibit ("Resp't Ex.") F at 95-96. Perkins' written statement detailed his involvement in the robbery and is set forth more fully *infra*.

After Perkins pled not guilty, a pre-trial suppression hearing was held in Monroe County Court on June 26, 1998; October 19, 1998; and October 22, 1998, to determine the admissibility of the oral and written statements made by Perkins to the police upon his arrest. Defense counsel argued that the police officers' testimony established that petitioner had invoked his Fifth Amendment right to remain silent during the first interview, and the subsequent written statement made during the second interview was obtained unconstitutionally and therefore should be suppressed.  Following the hearing, the trial court issued a written decision and order on January 19, 1999, finding that both Perkins' oral and written statements were admissible at trial. *See* Resp't Ex. G at 183-202.

Prior to trial, the prosecutor learned that Cruz, the victim, was no longer willing to testify at trial against Perkins because she claimed that he had made threats of intimidation against her. The prosecution moved for a *Sirois* hearing pursuant to *People v. Geraci*, 85 N.Y.2d 359 (N.Y.

1995) ("the *Sirois* hearing")[4] seeking to have Cruz's grand jury testimony and two supporting depositions she had made to the police admitted at trial in lieu of having her provide live testimony. Over defense objection, the *Sirois* hearing was held on February 22, 1999, and February 24, 1999, before Judge Mark in Monroe County Court.

The prosecution's chief witnesses were Inv. Janus and Inv. Weather, who had been involved in the robbery investigation. Inv. Janus also testified about his interview with petitioner on the day of his arrest, in which petitioner had identified two other participants in the robbery–one named "Lucky" and another named "Ted." SM 19-20.[5] Inv. Weather stated that when he showed Perkins a photo array containing a picture of an individual named Ted Francis, Perkins identified him as the Ted who allegedly had been involved in the robbery. SM 71. Importantly, Inv. Janus related that Perkins had been in police custody continuously since the day of his interview, which was the same date as the robbery. SM 18.

When Inv. Janus showed Cruz a photographic array containing a photograph of "Ted Francis" on February 28, 1998, Cruz pointed to his photo and indicated that she knew "Ted" from around the neighborhood. SM 21-23, 27. However, she was unable to identify him as one of the perpetrators. SM 43. Cruz did tell the investigators that she believed that in addition to Perkins and "Lucky", a third person was involved in the robbery but had remained outside the

---

[4]        "This type of hearing has been named after the defendant in *People v Sirois*, the criminal case that was considered in *Matter of Holtzman v. Hellenbrand*[, 92 A.D.2d 405 (App. Div. 2d Dept. 1983)]. In that case, the Second Department outlined the procedure to be followed "'whenever the People allege specific facts which demonstrate a 'distinct possibility' . . . that a criminal defendant's misconduct has induced a witness' unlawful refusal to testify . . . or has caused the witness' disappearance or demise[.]'" *People v. Geraci*, 85 N.Y.2d at 363 n.1 (quoting *Matter of Hotlzman v. Hellenbrand*, 92 A.D.2d at 415).

[5]        Citations to "SM __" refer to the transcript of the *Sirois* hearing held on February 22, 1999. Citations to "SMII __" refer to the continuation of that hearing held on February 24, 1999.

grocery store. SM 44. Cruz told the police that she had heard from several sources that the other

robbery victim, "Hector", whose real name was Luis Rijo ("Rijo"), had put a contract out on her

life. SM 47. (This was part of the reason that Cruz initially had been placed in protective custody.

In her initial statement to the police Cruz had given a false account of what had happened during

the robbery because Rijo, a/k/a "Hector", supposedly had told her not to say anything. SM 66.

During the course of their investigation, Inv. Janus and Inv. Weather learned information

concerning a March 29th homicide that had occurred in the City of Rochester. The victim, whose

real name was Ernesto Shannon ("Shannon"), had a streetname of "Lucky".  SM 24. (As per

Perkins' written statement to the police, "Lucky" also happened to be the streetname of one of

the participants in the robbery.) Both Janus and Weather believed that "Ted", a/k/a "Ted

Francis", was involved in the murder of "Lucky". SM 55, 85.

In the days following their interview with Perkins, Inv. Janus and Inv. Weather kept in

contact with Cruz, who informed them that she had been approached by a "light-skinned male

black with light eyes" who told her not to testify at Perkins' trial. SM 20-21. Based on the

information gleaned about the March 29th homicide, the police asked Cruz to look at an array

containing a photograph of Ernesto Shannon (a/k/a "Lucky"). Cruz identified Shannon/Lucky in

the array. SM 26.

The police remained in contact with Cruz, who informed them that "Ted" had approached

her and said that "Lucky was one of their own people and look what had happened to him" and

that it would be "not a good idea for to testify." SM 28-29. Cruz confirmed that "Ted" was Ted

Francis, whom she had identified in the photo array. SM 29. Notably, Cruz never told the

investigators that she had been contacted by Perkins himself. SM 35. According to Cruz's father,

Pedro Oliver ("Oliver"), "Ted" also had approached him and warned that "it would be a good idea if his daughter didn't testify." SM 73; SM II 13. Over the next few months, Cruz reiterated her desire not to testify and her fear for her safety in light of what had happened to "Lucky". SM 30-31.

The last meeting the investigators had with Cruz was when Inv. Janus attempted to serve the *Sirois* hearing subpoena on her; she told him that she was not going to testify because she feared for her life. SM 17-19. Cruz referred to Shannon/Lucky's murder and said that he had been killed because "he had been talking" and "she knew him." SM 31. Cruz also informed the police that Ted Francis had approached her boyfriend and told him that Cruz should not testify. Cruz confirmed that Ted was the individual who had been threatening her; she admitted that she knew him from the neighborhood and that he was an "associate" of Lucky's. SM 33.

The *Sirois* hearing was adjourned so that a material witness order could be executed for Cruz; when she was taken into custody, she announced, "they don't care about the robbery, it's the homicide [of Lucky] that they're concerned with.". SM 89; SM II 6, 10. Defense counsel was assigned to represent Cruz in connection with the *Sirois* hearing, and he informed the trial court that Cruz had expressed fear about testifying in front of Perkins. The prosecution proposed that the trial court conduct an *in camera* examination of Cruz without Perkins or his attorney being present. SMII 22. Over defense counsel's objection, the trial court accepted the prosecution's proposal.  During the *in camera* examination, neither the defense nor the prosecution were present. The trial judge permitted Perkins' defense counsel to submit questions to be asked of Cruz. SM II 23-24. However, the trial court declined to provide the defense with an actual transcript of the *in camera* hearing, finding that a summary would be sufficient.

Cruz testified *in camera* regarding the two occasions on which Ted Francis had approached her and stated that Lucky had been "killed by his own people" and suggested that she not testify at Perkins' trial. IC 3-4.[6] Cruz also said that her father had been approached by Ted who warned against having Cruz testify for this same reason. IC 5-6. Cruz related that Ted had told her boyfriend, "those are my peoples [sic] in jail, and she knows she can't go to court." IC 7. Finally, Cruz testified that Ted had been trailing her in his car. IC 8-9. Cruz had difficulty recalling the dates of these incidents, stating that her memory was "terrible." IC 6. She did say that Ted approached her before she testified at the grand jury and she believed the grand jury was held on March 9, 1998. IC 23-24.

Cruz testified *in camera* that Perkins was the more aggressive of the robbers and made threats *during* the robbery such as, "I'll kill you or I should have killed this bitch." IC 12. Cruz also testified that during the incident, Perkins said, "we know where your kids go to school at [sic] and if you say anything we will come back for you." IC 13. However, Cruz admitted that after the robbery, Perkins did not approach her or threaten her. IC 12, 17. Cruz testified that she had not received any letters or phone calls from Perkins. When asked why she did not want Perkins to see her in court, Cruz testified that she was "still not over [the robbery]" and was "not ready to be in front of him." IC 14. She stated that she had "been told, you should not go to court" and "being that there's two other homicides involved, I don't want to be the third." IC 14.

Defense counsel argued that the prosecution had failed to meet its burden of establishing that Perkins had either threatened Cruz or had orchestrated the intimidation of her. Perkins had been in custody since the day of the robbery on February 26, 1998, and the jailhouse visitation

---

[6]       Citations to "IC __" refer to the transcript of the *in camera* portion of the *Sirois* hearing.

logs, SM 88, showed that he was never visited by anyone named Ted Francis. Furthermore,

defense counsel pointed out, no one, including the victim, had testified that Perkins personally

had made any threats. Defense counsel argued that "Ted" had an independent reason for

attempting to intimidate Cruz, since he was a suspect in the robbery as well as the murders of

"Lucky"/Ernesto Shannon and Hector "Luis" Rijo. Because "Ted" had more at stake, he had

more to gain by Cruz's refusal to testify and it was thus more likely that he–rather than

Perkins–was making the threats to Cruz on his own initiative. 2/25/99 Tr. at 4.[7]

On March 15, 1999, Judge Mark issued a written decision and order holding that the

transcript of the victim's grand jury testimony and her out-of-court statements to the police

would be admissible at trial. *People v. Perkins*, 180 Misc.2d 495, 691 N.Y.S.2d 273 (N.Y. Sup.

Ct. 1999); *see also* Resp't Ex. G at 203-12. The trial judge conceded that "there was no direct

evidence to demonstrate that the defendant orchestrated the intimidation of the victim," but found

that "the prosecutor proved the same by presenting sufficient circumstantial evidence." *Id.*

(citation omitted); Resp't Ex. G at 211. The trial court did not identify what this circumstantial

evidence was, however.

Perkins' trial was conducted from May 1, 1999, to March 10, 1999, in Monroe County

Court. As noted above, as a result of the trial court's *Sirois* ruling, the robbery victim, Cruz, did

not testify at trial. The prosecution introduced into evidence (1) petitioner's written statement to

police, *see* TM 836;[8] (2) petitioner's oral admissions to the police (through the testimony of

Investigators Janus and Weather), *see* TM 752-93, 811-61; (3) the victim's two out-of-court

---

[7]        Citations to "2/25/99 Tr. at __" refer to the transcript of the hearing and argument held on
February 25, 1999.

[8]        Citations to "TM __" refer to the trial transcript.

statements to police; and (4) the victim's grand jury testimony, *see* TM 573, 645, 660.

According to Cruz's grand jury testimony, which was read into the record at trial, two black males entered the grocery store where she was working on Remington Street in the City of Rochester at about 10:05 a.m. on the morning of February 26, 1998. TM 574. The shorter of the two males, whom Cruz later identified in a show-up identification as Perkins, purchased a juice. The taller man went over to the payphone. TM 574-75. The two men then left the store but immediately returned. The shorter man then handed Cruz some money to pay for a "Philly blunt", a type of marijuana cigar. Cruz related that when she tried to give the shorter man his change, he pulled out a gun from the waistband of his pants and pointed it at her. TM 575. The shorter man then walked around behind the counter and ordered Cruz to remove her gold jewelry. After Cruz gave the shorter man (Perkins) her chains, he demanded the keys to the store and her pager, and demanded to know the location of her gun. TM 576. Cruz gave the men her keys and her pager, and the shorter man removed the money from the cash register and took the rest of Cruz's jewelry. TM 577-78. The shorter man said, "I don't want to hurt you, we are not here for you." TM 577.

Cruz stated that the men demanded to know the pager number of a man named "Hector," whom she knew to be a drug dealer. TM 577-79.  Cruz told the grand jury that the men said to her, "[W]e want Hector. You got to get Hector here." TM 579. They said that if she were not able to get Hector the store, "[t]hey were going to kill [her]." TM 579. Cruz gave them Hector's pager number and the "tall guy" went to the pay phone and paged Hector. TM 580. When Hector arrived, he was not able to get in through the front door because it was locked or broken; Cruz directed him around to the back of the store. TM 581. Cruz testified that when Hector saw that

she "was crying" as he was coming down the basement stairs, he "started running up the steps" but he "ran like [sic] into the door, and it closed on him." TM 582. The "shorter guy" pointed his gun at Hector, and the "taller guy" ordered Cruz to sit in a chair in the corner. TM 583. The two men started taping Hector with "big thick tape, electrical tape" and asked him, "[W]here is the shit? We want the shit. If not, this pretty girl dies." TM 583. They also demanded Hector's house keys and address, and they had Cruz ask him the same questions in Spanish. TM 583. Hector then revealed that "the shit" was located at 295 Avenue C upstairs in the attic. TM 584.

At that point, Cruz said, the "shorter guy" departed. He returned about twenty minutes later. TM 584-85. Shortly thereafter, the other, taller man left the store and the shorter man (Perkins) stayed with Cruz. TM 586. After another twenty minutes elapsed, Cruz told Perkins that she heard footsteps and that she thought her father and daughter were upstairs. TM 586. Cruz said that Perkins led her to the basement door to see if anyone was there. TM 586. When Cruz opened the door, she saw "seven or eight cops . . .  all lined up with [sic] the stairs all the way to the top." TM 586-87. Cruz said that she "moved out of the way and the police [we]re running after him [the shorter man, Perkins]." TM 587.

Cruz's grand jury testimony next described the show-up identification procedure conducted about an hour later while she was seated in a police car in front of the grocery store. TM 587-88. Cruz recognized Perkins to be "[t]he short guy" who participated in the robbery. She also identified a bag of property containing her two gold chains, watch, earrings, and "bundled-up money." TM 588.

In addition to Cruz's grand jury testimony and her out-of-court supporting depositions to the police, the prosecution's other proof consisted of the following testimony by the arresting

police officers. Investigator Thomas Baccanti ("Inv. Baccanti") became involved in the investigation when the police received a call for a "suspicious condition" at Willie's Grocery Store at about noon on February 26, 1998. TM 276, 637. Inv. Baccanti, along with Sgt. Prewasnicak, Officer Hernandez, and Officer Watkins, responded to Remington Street. TM 276, 638. When they arrived at about 12:10 p.m., TM 483, however, they were not able to gain immediate entry as all of the doors were locked. TM 282, 468, 484, 638. Once the store owner arrived with a key, the police officers entered the first floor. TM 638.

Finding no people in the main part of the store, the police proceeded to the basement where they found a woman (Cruz) who appeared to be "[v]ery upset" and "scared[.]". *E.g.*, TM 641. Cruz "pointed over towards an area of the basement and said something to the effect of[,] he's over there." TM 471. Sgt. Prewasnicak testified that he shined his flashlight around the basement, which was dark, and observed a man lying on the floor on his back; his mouth and hands had been duct-taped and he was bleeding from the head. TM 471-72. Two officers, Sgt. Prewasnicak and Officer Hernandez, observed a "man running through the basement" towards the door. They did not see his face, only that he was wearing "[d]ark clothing." TM 473-75.

Officer Barna, who was behind the store about twenty yards from the back-door, observed a black male, average build, wearing a dark jacket, blue jeans, and a light blue knit cap emerge from the back-door. TM 285-86. Officer Barna admitted on cross-examination that this black male "came out slowly" from the basement door and was not running. TM 325-26. Officer Barna ordered the man to "get on the ground." TM 286. After stopping briefly, the man continued to run away. Officer Barna observed a roll of duct tape in the man's right hand, which he dropped as he fled. TM 286, 288-90. Officer Barna could not recall whether this man was wearing gloves.

-12-

TM 327.

Officer Barna pursued the suspect on foot through the neighborhood, *see* TM 291-96, losing sight of him when he hopped a fence and ran up on the east side of the house at 500 Avenue D. TM 295-96. Officer Barna caught sight of the man running through backyards of Dale Street but ultimately lost him.

Upon hearing Officer Barna's broadcast giving a description of the suspect and his general location, Officer Gerbino drove to the area and observed a number of other officers running into the backyards. TM 359. Officer Gerbino stopped his car just east of 46 Dale Street and ran into the driveway of that location where he saw a person matching the suspect's description. TM 359-60. Assisted by a second police officer, Officer Gerbino took the suspect, later identified as Perkins, into custody. TM 362.

Prior to transporting Perkins back to Remington Street to the convenience store to conduct the show-up identification procedure, Officer Gerbino conducted a pat-down search during which he located a handgun-holster, various items of gold jewelry, and $78.60 in cash. TM 367-69.[9]

While waiting outside the police car back at Remington Street, the officers heard Perkins call out to two males walking by. He asked them to get him bail money, saying, "I got caught up in some dumb shit." TM 375. Shortly thereafter, while in transit to the police station, Perkins said to Officer Gerbino, "Officer, the investigator wants to speak with me. I don't want to go Upstate. I have never been to prison. I swear I will help." TM 377-78. Upon hearing a broadcast

---

[9]      Meanwhile, Officer Barna, once he knew that Perkins had been arrested, returned to 500 Avenue D, the area where he had heard the gunshot fired. There he located a .22-caliber shell casing. TM 308. In addition, two other handguns (a .22-caliber and a .380-caliber) were found along Perkins' flight path. TM 444-47. The shell casing was confirmed to have been fired from the same type of .22-caliber gun that was found. TM 619.

over the patrol car's radio that an officer had found duct tape in one of the yards, and Perkins announced, "That shit ain't [sic] mine." TM 378. Perkins then asked Officer Gerbino, "Did [the police] get the other guy?" TM 378.

Once back at the police station, Perkins was advised of his rights under *Miranda*, which he waived. TM 649-51. Initially, Perkins denied any involvement in the robbery to Investigators Baccanti and McAuliffe. At one point, however, Inv. Baccanti asked Perkins, "What really happened was you pointed a gun at her, at Claudia Cruz, and you took her money and jewelry . . . that's the way it happened?" TM 653. Perkins responded, "Yes, that's the way it happened." TM 653. Perkins also told the officers that the gun had gone off accidentally during the foot-chase. TM 654.

Investigators Baccanti and McAuliffe continued to question Perkins in an attempt to obtain information about the accomplice, but at about 7 p.m., Perkins indicated that he did not wish to make any additional statements. TM 655-56, 702. The investigators ceased the interview at this time and Perkins was taken to booking.

At about 8:00 p.m., Perkins was brought back to the an interview room by Investigators Janus and Weather. After Perkins had been waiting there four and one-half hours, Inv. Sennet arrived, along with Investigators Janus and Weather. Inv. Sennet introduced Perkins to Janus and Weather and then left. Weather said to Perkins, "Victor, I realize that you have been–you have been read your rights and you agreed to waive them. They still stand here during the conversation we're having now and that we're going to be having over the next few minutes," to which Perkins replied, "[Y]eah, no problem."

Investigators Weather and Janus told Perkins that they wanted to speak with him about

"what had happened earlier in the day and something else"–i.e., a homicide that had occurred

earlier that day. The police believed that the robbery of Willie's Grocery Store and the homicide

were related, and that Perkins had information about the homicide. According to Weather and

Janus, they were unaware that Perkins previously had invoked his right to remain silent. At

approximately 12:30 a.m., Perkins gave the investigators the following written statement, which

corroborated the victim's grand jury testimony and provided further details of his involvement in

the burglary:

> On Wednesday night, February 25, 1998, I was at 6 Thomas Street. This dude I
> know named "Lucky" came by. Lucky is a dark skinned Dominican due with
> medium braids in his hair. He is about 5'8" tall, and he has a little mustache.
> Lucky and I were talking and drinking. Lucky told me that he knew a guy who
> dealt drugs that had a lot of money. He told me that we could get the guy's money.
> He told me that we could go to the store on Remington Street and make the girl
> who owns the store page this guy, and when the guy got to the store, we would
> make him give up the money. I told Lucky to see me the next day.
>
> Lucky came by 6 Thomas Street the next day, Thursday. He was wearing a black
> coat, blue jeans, a black knit cap and white[,] blue and black Fila sneakers. He
> picked me up in a black, four door car, like a Toyota. He gave me a gun, and he
> told me we were going to the store on Remington. When we got to the store, we
> went inside. There was this Spanish girl in there, I think she was the owner. Lucky
> pointed the gun that he had at the girl. He said, ["]Bitch, page Popi." She tried to
> say she didn't know the number, but Lucky said, "Bitch, stop lying." I took the
> gold the girl was wearing, she had two chains and had a ring, and a gold, thin
> watch. Lucky took the money from the cash register. Then, Lucky took a piece of
> paper with a phone number on it from near the register. Lucky told me to page the
> number, and put the Spanish girl's number in it. Lucky told me that this Spanish
> girl's name was Claudine.
>
> I paged the number from the phone booth. I put in the girl's code, which was 335.
> Lucky took Claudine down in the cellar of the store. After about ten or fifteen
> minutes, this Spanish guy came to the store. He tried to get in the front door, but
> Lucky had locked it. He want around to the back door, and Lucky had Claudine
> meet him there. She opened the door, and when the guy came in, Lucky grabbed
> him. He brought the guy downstairs. He went in the guy's pockets, and took his
> keys and wallet. He put duct tape, which he had brought with him, around the
> guys [sic] wrists.
>
> Lucky was wearing white surgical gloves. Lucky and I hit the guy. Lucky was
> hitting the guy, asking him where's the money. Lucky said he knew the guy had a

lot of houses and sold a lot of dope. He told the guy, who Claudine said was named Hector, that he wanted twenty thousand dollars. The guy Hector tried to say he didn't have any money. Lucky stuck the gun in Hector's mouth. I thought Lucky was gonna [sic] blow the guys [sic] brains out. The guy Hector said, "Okay Popi, Okay Popi, don't hurt me." Then Hector said something in Spanish, and Claudine said that Hector said it was at 295 Avenue C in the wall of the attic. Lucky left the store at that time for about half an hour. I'm not sure where he went. He came back in. Then, I left for a little while to make sure that Claudine's father wasn't around. Claudine had said her father may be coming to the store with her daughter. I went back inside, and then Lucky gave me his gun. He said for me to watch them, then he left. He was gone for a long time, over an hour. I was talking to Claudine during this time, trying to calm her down.
Claudine said she heard someone upstairs. She opened the basement door that lead [sic] to the store. She screamed, "No, what's wrong." [sic] I ran out the back door. I had a gun with me, and it went off accidentally. I ran, and the cops caught me. . . .

Resp't Ex. F at 95-96.

The returned a verdict acquitting Perkins of (1) the charge of unlawfully imprisoning Cruz, the store clerk, and (2) the charges of second degree criminal possession of a weapon which related to the allegation that he discharged the gun in Officer Barna's direction during the foot-chase. The jury found Perkins guilty of the charge of first degree robbery and the two counts of third degree criminal possession of a weapon. Perkins was sentenced on May 11, 1999, as a second violent felony offender to determinate terms of imprisonment of twenty years on the robbery and seven years on both weapons charges, those sentences to run concurrently with each other.

On direct appeal, appellate counsel for Perkins argued that  (1) the trial court violated petitioner's Sixth Amendment Confrontation Clause rights by allowing the victim's grand jury testimony and her supporting depositions to be admitted as evidence despite her failure to testify at trial; (2) the trial court violated petitioner's Sixth Amendment Confrontation Clause and Fifth

-16-

Amendment due process rights to be present at all material stages of trial by excluding petitioner and defense counsel from the *in camera* interview of the victim during the *Sirois* hearing; and (3) the trial court violated petitioner's *Miranda* rights by holding that petitioner's written statement to the police was admissible; and the sentence was unduly harsh and severe. *See* Petitioner's Appellate Brief, Respondent's Exhibits ("Resp't Ex.") E.

A divided panel of the Appellate Division affirmed Perkins' conviction. The three-justice majority agreed with Perkins that the trial court "erred in admitting the Grand Jury testimony of the store owner [Cruz] in place of her live testimony at trial" because "[t]he People failed to establish that the 'witness's unavailability was procured by the defendant', and all of the threats warning the store owner not to testify were made by a suspected accomplice, not defendant[.]" *People v. Perkins*, 289 A.D.2d 940, 941, 735 N.Y.S.2d 273, 274 (App. Div. 4th Dept. 2001) (majority opn.) (quoting *People v. Geraci*, 85 N.Y.2d 359, 369 (N.Y. 1995) and citing *People v. Cotto*, 92 N.Y.2d 68, 76-77 (N.Y. 1998)). In addition, the trial court erred in admitting Perkins' written statement to the police. *Id.* (citing *People v. Brown*, 266 A.D.2d 838, 700 N.Y.S.2d 605 (App. Div. 4th Dept.), *lv. denied*, 94 N.Y.2d 860 (N.Y. 1999)). However, the majority concluded, "both errors [we]re harmless." *Id.*, 735 N.Y.2d at 275.[10] The two dissenting justices in Perkins' case disagreed with the majority's conclusion that the Sixth Amendment Confrontation Clause error and *Miranda* error were harmless and voted to modify the judgment by reversing the conviction of robbery in the first degree (N.Y. Penal Law § 160.15(4)). *People v. Perkins*, 289 A.D.2d at 942 (dissenting opn.).

---

[10]     The Appellate Division did not specifically address Perkins' contention that the trial court erred in holding that the *Sirois* hearing was a material stage of trial and his exclusion from the *in camera* examination of the victim violated his Sixth Amendment right to be present at all material stages of trial.

Appellate counsel sought leave to appeal to the New York Court of Appeals on all of the issues raised before the Appellate Division. The Court of Appeals summarily denied leave to appeal, however. *People v. Perkins*, 98 N.Y.2d 654 (N.Y. 2002).

Perkins then timely filed his federal habeas petition in this Court, asserting the same grounds for relief as he raised on direct appeal. Respondent does not raise the defense of non-exhaustion with regard to any of Perkins' claims. Indeed, all three claims were raised on direct appeal in the appellate brief to the Appellate Division and in the application seeking leave to appeal, making them fully exhausted. As Perkins has fulfilled the exhaustion requirement, I may consider whether his claims merit habeas relief. *See* 28 U.S.C. 2254(b)(1).

For the reasons that follow, Perkins' petition for a writ of habeas corpus is granted.

## III.   REVIEW STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.*, § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir. 2000). The phrase, "clearly established Federal law, as determined by the

-18-

Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *accord, e.g.*, *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003); *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001). In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV.   ANALYSIS OF THE PETITION

### A.      Violation of the Sixth Amendment Right of Confrontation

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This right of confrontation is a "'fundamental right essential to a fair trial in a criminal prosecution[.]'" *United States v. Dhinsa*, 243 F.3d 635, 651 (2d Cir. 2001) (quoting *Pointer v. Texas*, 380 U.S. 400, 404 (1965)). The Supreme Court has explained that "the main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (quotation marks omitted, emphasis in original); *accord Dhinsa*, 243 F.3d at 651.

"Because '[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska*, 415 U.S. [at 316], '[t]he opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process[,]' *Kentucky v. Stincer*, 482 U.S. 730, 736  (1987)." *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003). Accordingly, courts have found in the Confrontation Clause a "strong presumption" that all testifying witnesses should be subjected  to cross-examination, and that a witness' out-of-court statements should not be introduced in lieu of that witness providing in-court testimony which is through the scrutiny of cross-examination. *Cotto*, 331 F.3d at 229.[11]  In general, then, the Sixth Amendment bars a witness' out-of-court

---

[11]      As the Supreme Court explained in *Pointer v. Texas*, 380 U.S. 400, 405 (1985), "[t]here are few subjects, perhaps, upon which [it] and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Accord, e.g.*, *Cotto*, 331 F.3d at 229.

statement from being admitted in a criminal trial absent the witness being available[12] at the trial

for both confrontation and cross examination.

The right of confrontation is not absolute, however, and the Supreme Court has held that

a criminal defendant's intentional misconduct may result in a waiver of this particular Sixth

Amendment right. *See Illinois v. Allen*, 397 U.S. 337, 342-43 (1970) ("[W]e explicitly hold today

that a defendant can lose his right to be present at trial if, after he has been warned by the judge

that he will be removed if he continues his disruptive behavior, he nevertheless insists on

conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his

trial cannot be carried on with him in the courtroom."). The Second Circuit, as well as a majority

of other circuit courts, has applied the "waiver-by-misconduct rule" in cases where the defendant

has "wrongfully procured a witness' silence through threats, actual violence or murder." *Cotto v.*

*Herbert*, 331 F.3d at 232 (citing *United States v. Dhinsa*, 243 F.3d at 651); *see also United States*

*v. Mastrangelo*, 693 F.2d 269, 272-273 (2d Cir.1982) ("[W]hen a witness' silence is procured by

the defendant himself . . . the defendant cannot then assert his confrontation clause rights in order

to prevent prior grand jury testimony of that witness from being admitted against him."), *aff'd on*

*rehearing*, 722 F.2d 13 (2d Cir. 1983), *cert. denied*, 467 U.S. 1204 (1984); *Reynolds v. United*

*States*, 98 U.S. 145 (1878). Federal courts have held that the procuring conduct may be

performed by the defendant himself or by others acting on his behalf. *See Rice v. Marshall*, 709

F.2d 1100 (6th Cir.1983) (affirming finding of no confrontation clause error where record was

---

[12]      A witness is not "available" for cross examination when that witness refuses to testify. *Douglas v. Alabama*, 380 U.S. 415 (1965); *see also Bruton v. United States*, 391 U.S. 123 (1968); *Nelson v. O'Neil*, 402 U.S. 622 (1971). "This is equally true whether the refusal to testify is predicated on privilege or is punishable as contempt, so long as the refusal to testify is not procured by the defendant." *Rice v. Marshall*, 709 F.2d 1100, 1102 (6th Cir. 1983) (citing *Mayes v. Sowders*, 621 F.2d 850, 855 (6th Cir. 1980) (citing, *inter alia, Douglas v. Alabama*, 380 U.S. at 420; *Motes v. United States*, 178 U.S. 458, 471 (1900)).

clear that reason for witness' unavailability was his fear for his life at the hands of petitioner, the "national enforcer" of the motorcycle gang, or his functionaries; it was reasonable for trial court to conclude that witness had been intimidated into silence by appellant "or his functionaries", *cert. denied*, 465 U.S. 1034 (1984).[13]

Perkins contends, as he did on direct appeal, that the trial court violated his Sixth Amendment Confrontation Clause rights in finding that he had intimidated the victim and that therefore her grand jury testimony and out-of-court statements were admissible in place of her live testimony at trial. The Appellate Division agreed, holding that "[t]he People failed to establish that the 'witness's unavailability was procured by the defendant', *People v. Perkins*, 289 A.D.2d at 941 (quoting *People v. Geraci*, 85 N.Y.2d at 369; citing *People v. Cotto*, 92 N.Y.2d at 76-77). As the Appellate Division found, the prosecution's proof at the *Sirois* hearing merely established that "all of the threats warning the store owner not to testify were made by a suspected accomplice, not defendant[.]" *Id.* I agree with the Appellate Division's finding on this point; the trial court, in holding otherwise, mischaracterized the evidence presented at the *Sirois* hearing. For instance, the trial court held that the following testimony provided by the victim (without petitioner or his counsel being present) "linked" the threats made by Ted Francis to Perkins:

> That because she was robbed by the defendant and Lucky, and Lucky was killed by his associates, *the defendant* and Ted, she interpreted this as a threat on her life by them if she testified; that *Ted* told her father to advise her not to testify, because she would be testifying against the same individuals who killed Lucky;

---

[13]     The Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), holding that the Sixth Amendment's Confrontation Clause prohibits admission of out-of-court testimonial statements made by unavailable declarants where the defendant is afforded no prior opportunity for cross-examination, did not disturb this longstanding rule. *See* 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds. . . .").

> that *Ted* told her boyfriend to advise her not to testify, because "his [*Ted's*] peoples" [sic] were in jail; that during the robbery the defendant threatened to kill her many times and also threatened her that if she said anything the robbers would come back for her.

*People v. Perkins*, 180 Misc.2d at 500 (footnote omitted; emphases supplied). The trial court, however, clearly erred in stating that the evidence showed that "Lucky was killed by his associates, the defendant and Ted . . . ." *Id.* To the contrary, the proof at the *Sirois* hearing was that Perkins had been in custody since February 26, 1998, the day of the robbery, while Lucky's murder did not occur until a month later, on March 29, 1998. Therefore, Perkins could not have killed Lucky, and there was no evidence presented at the *Sirois* hearing that either he had arranged to have Lucky murdered or had been in contact with Ted Francis during the time he (Perkins) was incarcerated. Moreover, I must take issue with the trial court's unsubstantiated statement that "there were inferences to be drawn from the evidence that pointed to the defendant as the individual responsible for the intimidation . . . ." As support for this, the trial court quoted the following statement from a New York Court of Appeals case, *People v. Cotto*: "'there was no suggestion that anyone else stood to gain from the witness's silence[.]'" *People v. Perkins*, 180 Misc.2d at 500 (quoting *People v. Cotto*, 92 N.Y.2d at 77). To the contrary, in Perkins' case, someone else *did* stand to gain from Cruz's silence. The testimony from the police investigators, from the victim, and from the victim's father was unequivocal: *all* of the threats against the victim were made by one man–Ted Francis, who was not only a participant in the robbery of Willie's Grocery Store but also was a suspect in the murder of Ernesto "Lucky" Shannon. Thus, in contrast to *People v. Cotto*, there *was* another individual who had a greater motive than Perkins to keep Cruz out of the courtroom–Ted Francis. Singularly lacking on this record is any proof–direct or circumstantial–that Ted Francis' threats toward Cruz were made at Perkins'

behest. The trial court's findings that the evidence "linked" the threats to Perkins and that there were "inferences . . . that pointed to the defendant as the individual responsible" were not only clearly erroneous, but were based on an unreasonable determination of the facts presented at the *Sirois* hearing. Therefore, the admission of the victim's grand jury testimony and pre-trial statements to police in lieu of her live testimony at trial violated petitioner's Confrontation Clause rights under the Sixth Amendment.

Confrontation Clause errors are subject to harmless-error analysis. *See*, *e.g.*, *Van Arsdall*, 475 U.S. at 684; *Chapman v. California*, 386 U.S. 18, 21-22 (1967). In *Van Arsdall*, the Supreme Court instructed that the effect of a Confrontation Clause error should be considered in light of "a host of factors," including (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted," and (5) "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684 (citing *Harrington v. California*, 395 U.S. 250, 254 (1969)); *accord Cotto*, 331 F.3d at 232 (noting that *Van Arsdall* "outlined a series of factors to consider when a Confrontation Clause violation should be considered harmless error"). I cannot agree, however, with the majority's finding that this Sixth Amendment error was harmless, as discussed more fully in Part III.D, *infra*.

**B.      Violation of the Sixth Amendment and Fifth Amendment Due Process Rights to Be Present at All Material Stages of Trial**

"'The right to be present at all stages of one's trial constitutes a foundational principle underpinning the entire law of criminal procedure.'" *United States v. Doe*, 964 F.2d 157, 158 (2d Cir.) (quoting *United States v. Fontanez*, 878 F.2d 33, 35 (2d Cir.1989)), *cert. denied*, 506 U.S.

1009 (1992); *accord*, *e.g.*, *United States v. Canady*, 126 F.3d 352, 360 (2d Cir.1997), *cert. denied*, 118 S. Ct. 1092 (1998). The principle that the accused has a right to be present at all material stages of trial inheres in the confrontation clauses of the United States and New York Constitutions and is articulated in both federal and state rules of procedure. *See* U.S. CONST. amend. VI; N.Y. CONST. art. I, § 6; FED. R. CRIM. P. 43; N.Y. CRIM. PROC. LAW §§ 260.20, 340.50. "It has long been settled that an accused enjoys a right both at common law and pursuant to the sixth amendment's confrontation clause to be present at all stages of trial." *United States v. Fontanez*, 878 F.2d at 35; *accord*, *e.g.*, *Illinois v. Allen*, 397 U.S. 337, 338 (1970). "The defendant's right to be present at trial is also implicated by the fair trial concerns of the Fifth and Fourteenth Amendments, '"'to the extent that a fair and just hearing would be thwarted by [the defendant's] absence.'"'" *Polizzi v. United States*, 926 F.2d 1311, 1318 (2d Cir. 1991) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745  (1987) (in turn quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)). Thus, the Supreme Court stated in *Stincer*, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." 482 U.S. at 745.

Both New York state and Federal law observes a "law-fact" dichotomy in determining when the right to be present attaches. Thus, the New York Court of Appeals has held that pre-trial hearings where testimony is taken and questions of fact are to be determined are included in the definition of "trial," while "in the argument of a motion to decide a pure question of law, no right to be present inures to a defendant." *See People v. Anderson*, 16 N.Y.2d 282, 288 (N.Y. 1965). Similarly, as a matter of Federal law, the defendant need not be present at "a conference or hearing upon a  question of law." FED. R. CRIM. P. 43(c)(3). But, "[i]f fact issues

are presented, however, as they often will be on a pretrial motion to suppress evidence or on some motions for new trial, it would seem that defendant has a right to be present." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (holding that presence at a pre-trial *Wade* hearing "clearly falls within the scope of the right") (quoting 3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 721.1 at 12 (2d ed.1982)).

The state trial court in Perkins' case concluded that the *Sirois* hearing was not a material stage of trial. Resp't Ex. G at 209-10.  After noting the New York Court of Appeals had held in *People v. Turaine* "a defendant's exclusion during a hearing to determine if a prosecution witness should be allowed to testify at trial that the defendant intimidated him was reversible error," the state trial court determined *Turaine* could be distinguished

> because it did not involve the situation encompassed by a *Sirois* Hearing. Where a witness refuses to testify at trial because of a defendant's misconduct, the defendant forfeits his rights of confrontation. This rule should be extended to include a situation in which the defendant's misconduct is so egregious that the witness refuses to testify at a *Sirois* hearing.

Resp't Ex. G at 209. A quotation from *People v. Turaine* fails to elucidate the purported distinction:

> The purpose of the hearing in [*People v. Turaine*] was to elicit the witness's version of the facts surrounding the alleged intimidation so that the court could determine its admissibility at trial. Defendant was entitled to confront the witness against him at that hearing and also to be present so that he could advise counsel of any errors or falsities in the witness' testimony which could have an impact on guilt or innocence.

*People v. Turaine*, 78 N.Y.2d at 872. Moreover, the very purpose of a pre-trial *Sirois* hearing is to determine whether a defendant, by his alleged misconduct, has forfeited his Sixth Amendment right to confront witnesses later at trial. As the excerpt quoted from the trial court's decision

-26-

makes clear, the only way it was able to conclude that the exclusion of the defense from the *in camera* examination of the victim was to *assume* the ultimate fact in issue at the *Sirois* hearing–that petitioner should be excluded from the hearing to determine whether he had intimidated the victim *because* he had intimidated the victim. In other words, the trial court decided to conduct the *in camera* examination of the victim during the *Sirois* hearing and exclude Perkins and defense counsel *before* rendering a decision on whether or not Perkins was responsible for the threats made against the victim. The state court's holding is a particularly egregious example of "circular logic".

Perhaps recognizing that its holding did not rest on the firmest of footings, the state trial court went on to note that its "theory [wa]s not entirely without precedent." Resp't Ex. G at 209. However, neither the intermediate appellate level New York state cases that the trial court cites, nor the applicable federal cases support its theory. *See Kentucky v. Stincer*, 482 U.S. at 740. In *Stincer,* the Supreme Court rejected the state's argument that the competency hearing was not "stage of trial"; "[a]lthough questions regarding the guilt or innocence of the defendant usually are not asked at a competency hearing, the hearing retains a direct relationship with the trial because it determines whether a key witness will testify." Similarly, the *Sirois* hearing in Perkins' case determined whether Cruz, the victim and the prosecution's chief witness, would testify in person at trial. The Supreme Court explained in *Kentucky v. Stincer* that the "question whether a particular proceeding is critical to the outcome of a trial is not the proper inquiry in determining whether the Confrontation Clause has been violated." Rather, [t]he appropriate question is whether there has been any interference with the defendant's opportunity for effective cross-examination." *See also id.* ("Instead of attempting to characterize a competency hearing as

a trial or pretrial proceeding, it is more useful to consider whether excluding the defendant from the hearing interferes with his opportunity for effective cross-examination.").

In *Kentucky v. Stincer*, the respondent challenged his exclusion from the competency hearing regarding the admissibility of testimony by the two the child complainants, arguing that his Sixth Amendment Confrontation Clause and Due Process rights were violated. The Supreme Court disagreed, noting that the witnesses were found competent, "they appeared and testified in open court. At that point, the two witnesses were subject to full and complete cross-examination, and were so examined." *Id.* at 740; *see also id.* at 744 (finding no Confrontation Clause violation when defendant was excluded from competency hearing where it did not interfere with his right to "effective" trial cross-examination of the witnesses); *see also California v. Green*, 399 U.S. 149, 159 (1970) ("[T]he inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial."). In Perkins' case, by contrast, the defense's ability to engage in *any* cross-examination at trial was affected by his exclusion from the *Sirois* hearing, since as a result of the *Sirois* hearing, the victim did not have to appear personally in court. Perkins' ability either for full or effective cross-examination of the victim was entirely abridged; his rights under the Confrontation Clause thus were violated by his exclusion from the *in camera* examination of Cruz at the *Sirois* hearing.

With regard to whether petitioner's Due Process rights under Fourteenth Amendment were violated by his exclusion from the *in camera* portion of the *Sirois* hearing, I believe that his presence hearing did bear a substantial relationship to his opportunity better to defend himself at trial.  The Supreme Court has explained the right to presence protected by the fair trial concerns

-28-

of the Due Process Clause of the Fifth and Fourteenth Amendments thusly:

> The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g.*, *Illinois v. Allen*, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S. Ct. 330 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.

*United States v. Gagnon*, 470 U.S. 522, 526-27 (1985) (citations omitted); *accord, e.g.*, *Kentucky v. Stincer*, 482 U.S. at 745; *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975). Here, the *Sirois* hearing certainly involved Perkins "actually confronting" the main witness against him. The Supreme Court stated in *Kentucky v. Stincer* that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." In *Stincer*, the Supreme Court found no violation of the respondent's due process rights occasioned by his exclusion from the witness competency hearing because he gave "no indication that his presence . . . would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify." 482 U.S. at 747. The Supreme Court found it significant that Stincer "presented no evidence that his relationship with the children, or his knowledge of facts regarding their background, could have assisted either his counsel or the judge in asking questions that would have resulted in a more assured determination of competency." *Id.* Perkins, by contrast, did have knowledge concerning the facts and circumstances to which Cruz, the victim, was testifying at the *Sirois* hearing. There is no question in this Court's opinion that petitioner–or at least his defense counsel–could have

assisted the judge in asking questions during the examination of Cruz that would have resulted in a more "assured determination" of who was responsible for intimidating her.

While the Court understands the trial court's effort in employing its facially appealing but erroneous logic in working its way through a difficult decision, its "unique solution" to the problem presented at the *Sirois* hearing by the fearful witness–excluding *both* the defendant and defense counsel from her examination at the *Sirois* hearing–was a misguided and unjustified infringement of Perkins' Sixth Amendment and Due Process rights. The fact that the trial court also excluded the prosecutor "out of an excess of caution" was not redeeming. For the reasons discussed in Part III.D, *infra*, I cannot find that Perkins' absence from the *in camera* examination of the victim at the *Sirois* hearing was harmless error. *See*, *e.g.*, *Rushen v. Spain*, 464 U.S. 114, 117 n. 2, 118-19 (1983) (explaining that "violations of the right to be present during all critical stages of the proceedings" are, "as with most [violations of] constitutional rights, . . . subject to harmless-error analysis, unless the deprivation, by its very nature, cannot be harmless ") (internal citations omitted); *accord Yarborough v. Keane*, 101 F.3d 894, 897-98 (2d Cir. 1996).

### C.      Fifth Amendment Right Against Self-Incrimination

In order to dispel the inherently coercive pressure of custodial police interrogation, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), "promulgated a set of safeguards to protect the . . . constitutional rights of persons subjected to police interrogation." *Michigan v. Mosely*, 423 U.S. 96, 99 (1975). In addition to requiring that the suspect be warned of his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination, *Miranda* also requires that the police "scrupulously honor [ ]," 384 U.S. at 479, any invocation of the right to remain silent. If the accused "indicates in any manner, at any time prior to or during

questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 423 U.S. at 473. At that point, the suspect "has shown that he intends to exercise his Fifth Amendment privilege" making any statement taken afterward "the product of compulsion, subtle or otherwise." *Id.* at 473-74; *see also Michigan v. Mosley*, 423 U.S. at 101-06 (reaffirming that when suspect indicates he wishes to remain silent, interrogation must cease, but stating that questioning may, under certain circumstances, resume later); *United States v. Collins*, 462 F.2d 792, 802 (2d Cir. 1972) (*en banc*).

Subsequently, the Supreme Court declined to read *Miranda* to "create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosely*, 423 U.S. at 102-03 (footnote omitted). In *Mosely*, the defendant had unambiguously invoked his right to silence in response to police interrogation; the next morning, however, different officers came to question him about a different crime, again advised him of his rights, and secured his agreement to answer questions. Four factors convinced the Supreme Court that the renewed questioning was permissible in the particular case before them:

> This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, ... by persisting in repeated efforts to wear down his resistance and change his mind. In contrast to such practices, the police here [1] immediately ceased the interrogation, [2] resumed questioning only after the passage of a significant period of time and [3] *the provision of a fresh set of warnings*, and [4] *restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.*

*Mosley*, 423 U.S. at 105-06 (emphases supplied). The Supreme Court rejected the defendant's argument that *Miranda*'s command that "interrogation must cease" after an unambiguous invocation of the right to remain silent precluded the later questioning. Although complying with

-31-

the command to "cease" requires more than "a momentary cessation of questioning," it does not

require "permanent immunity from further interrogation." 423 U.S. at 102.

There is no question that Perkins unequivocally invoked his Fifth Amendment privilege,

and the interrogation ceased at about 4:30 p.m. When the police investigators started to interview

him later that night, they "'reminded' defendant that he had been read his rights earlier and had

agreed to waive them." *Id.* At about 12:30 a.m., he gave his written statement. The Appellate

Division correctly held that the admission of his written statement was made in violation of the

Fifth Amendment right against self-incrimination since the police "failed to repeat the requisite

[*Miranda*] warnings . . . ." *People v. Perkins*, 289 A.D.2d at 941 (citation omitted). A cursory

review of the record indicates that Inv. Sennet did not provide "a fresh set of warnings," *Mosely*,

423 U.S. at 105-06, or "restrict[ ] the second interrogation to a crime that had not been a subject

of the earlier interrogation," *id.*

The constitutional error occasioned by the admission of a defendant's confession in

violation of his *Miranda* rights is subject to review for harmlessness. *Zappulla v. New York*, 391

F.3d 462, 466 (2d Cir. 2004) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *Brown v.

Keane*, 355 F.3d 82, 91 (2d Cir. 2004)). In *Brecht*, the prosecution erroneously referred to the

defendant's post-*Miranda* silence; the Supreme Court, in reviewing the harmfulness of that Fifth

Amendment error, relied on several factors also found in *Van Arsdall*–namely, the prominence of

the constitutional error, whether the improperly admitted testimony was "cumulative," and the

strength of the prosecution's other evidence. 507 U.S. at 639. Similarly, the Second Circuit has

instructed that the following factors, distilled from the Supreme Court's precedents on *Miranda*

violations, are relevant in determining whether the erroneous admission of a confession was

harmless error: (1) the overall strength of the government's case; (2) the government's conduct (e.g., degree of reliance) with regard to the confession; (3) the importance of the improperly admitted confession; and (4) whether the confession was cumulative of other, properly admitted evidence. *Id.* (citations omitted).

### D.     The Sixth Amendment and Fifth Amendment errors were not harmless.

In *Fry v. Pliler*, __U.S. __, 127 S. Ct. 2321, 2328 (June 11, 2007), the Supreme Court resolved a split among the circuit courts regarding the proper harmless-error standard to apply in habeas cases governed by AEDPA, and held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*[ *v. Abrahamson*, 507 U.S. 619 (1993)] . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[14] . . . ." *Fry v. Pliler*, 127 S. Ct. at 2328.  The standard enunciated in *Brecht* requires asking whether the constitutional violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). *Fry*, 127 S. Ct. at 2326-27.  The Supreme Court in *Fry* therefore explicitly rejected the notion (which had been adopted by some circuit courts) that AEDPA replaced the *Brecht* standard with the standard of *Chapman* plus AEDPA deference when a state court has made a harmless-error determination. Thus, the *Brecht* standard applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set

---

[14]     *Chapman* was a case that reached the Supreme Court on direct review of a state-court criminal judgment; there it was held that a federal constitutional error can be considered harmless only if a court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

forth in *Chapman*." *Id.* As a consequence, a habeas court's task is to apply the *Brecht* standard

independently.[15] Additionally, although *Brecht* is a more forgiving standard than *Chapman*, the

burden remains on the prosecution to show harmlessness: "[W]hen a court is 'in virtual equipoise

as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . .

as if it affected the verdict. . . .'" *Fry*, 127 S. Ct. at 2328 n. 3 (quoting *O'Neal v. McAninch*, 513

U.S. 432, 435 (1995)). *See also Fry*, 127 S. Ct. at 2328-2330 (emphasizing that *Brecht* "imposes

a substantial burden of persuasion on the State," and that when federal habeas courts find

constitutional error, "they may not lightly discount its significance") (Stevens, J., concurring).

Under *Brecht*, this Court must determine whether the errors at Perkins' trial resulted in

"actual prejudice" to him, i.e., had a "substantial and injurious effect or influence in determining

the jury's verdict." *Kotteakos*, 328 U.S. at 776. This means that the reviewing court must

"ponder[ ] all that happened without stripping the erroneous action from the whole. . . ." *Fry*, 127

S. Ct. at 2328 (Stevens, J., concurring) (quoting *Kotteakos*, 328 U.S. at 765). As the Supreme

Court explained in *Kotteakos*, as a federal court assessing the harmfulness of a constitutional

error, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from

the phase affected by the error. It is rather, even so, whether the error itself had substantial

influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S.

at 765; *accord O'Neal*, 513 U.S. at 435-36 (holding that when a federal habeas court finds a

constitutional trial error and the record is so evenly balanced that a conscientious judge is in

"grave doubt" about whether the error had a "substantial and injurious effect or influence in

---

[15]     The Court also notes that even though *Fry* was decided during the pendency of this petition, its
holding governs this Court's review of the state courts' harmless error determination because harmless error "is not a
rule concerning what state courts must do and therefore may change without being thought impermissibly
retroactive," *Rodriguez v. Chandler*, 492 F.3d 863, 865 (7th Cir. 2007).

determining the jury's verdict," the error is not harmless, and the petitioner must win).

In Perkins' case, the Appellate Division held that the Confrontation Clause and *Miranda* errors were harmless because "[d]efendant's oral admission of guilt was properly admitted, defendant was identified by an officer who saw him inside the store, and defendant was apprehended immediately after the robbery while in possession of the stolen property." *People v. Perkins*, 289 A.D.2d at 941. Therefore, the majority of the Appellate Division found, "there [wa]s no reasonable possibility that the errors might have contributed to the conviction and thus . . . the errors [we]re harmless beyond a reasonable doubt[.]" *Id.* (citing *People v. Brown*, 266 A.D.2d at 838-839 (finding that written statement taken in violation of *Miranda* protections "added nothing" to defendant's oral statement and its admission was harmless); *People v. Crimmins*, 36 N.Y.2d 230, 237 (N.Y. 1975).[16]

The dissenting justices found that the violations of Perkins' constitutional rights to confrontation and to remain silent were not harmless because, on the trial record, it "cannot be said that the store owner's Grand Jury testimony and supporting deposition and defendant's written statement 'added nothing' to defendant's oral statement[.]" *People v. Perkins*, 289 A.D.2d at 942, 735 N.Y.S.2d at 275-76 (dissenting opn.) (quoting *People v. Brown*, 266 A.D.2d at 839). I wholly agree with the dissenting justices' analysis of the erroneously admitted evidence, *see id.*, and their conclusion that it was "the evidence that explained to the jury that robbery in fact occurred," *id.* Thus, with regard to the first and second *Van Arsdall* factors

---

[16] The New York Court of Appeals in *People v. Crimmins* stated in *dicta* that errors of law under the New York state and federal constitutions "call for reversal and a new trial unless it was harmless under the test for harmless constitutional error laid down by the Supreme Court of the United States, namely, that there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt[.]"

relevant to a Confrontation Clause error analysis, there is no question that Cruz's grand jury testimony and statements to the police were extremely important to the prosecution's case–in fact, they were of critical importance, and they were certainly not cumulative. As dissenters found, "[w]ithout the store owner's Grand Jury testimony and supporting depositions, and defendant's written statement, the *only evidence* establishing that defendant forcibly stole property from the store owner is defendant's oral statement." *People v. Perkins*, 289 A.D.2d at 942 (dissenting opn.) (emphasis supplied).

The Appellate Division majority in Perkins' case found that Officer Barna had identified petitioner inside the store, but I do not believe that this rendered cumulative the victim's testimony regarding Perkins' involvement in the robbery. *Compare with Cotto v. Herbert*, 331 F.3d at 254 ("Echevarria's trial testimony and out-of-court statements were not cumulative–the second *Van Arsdall* factor–as he was the only person besides Davilla to identify Cotto as the shooter."); *Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007) ("The mere fact that one other witness . . . has testified to a particular fact (here that [petitioner] was holding a handgun) does not render other testimony on that point 'cumulative.' This potential bolstering weighs against finding harmless error.") (citing *Stapleton v. Wolfe*, 288 F.3d 863, 865-66, 868 (6th Cir. 2002)); *Arizona v. Fulminante*, 499 U.S. at 299 (deeming one confession not "cumulative" of another, despite some overlapping details, where "the jury might have believed that the two confessions reinforced and corroborated each other" and concluding that the Fifth Amendment error in admitting the confession was not harmless); *Stapleton*, 288 F.3d at 865-66, 868 (relying on *Arizona v. Fulminante* to reverse a state court's harmless-error determination despite AEDPA deference by concluding that one co-defendant's confession inculpating the defendant was not

cumulative of another co-defendant's confession also implicating the defendant).

With respect to the *VanArsdall* third factor–the degree of corroborating or contradictory evidence on material points of the witness's testimony–the only detailed corroborating evidence to the victim's testimony was provided by Perkins himself in his written statement to police–which also had been improperly admitted. Without the victim's grand jury testimony and out-of-court statements, and the petitioner's written confession, the only evidence establishing that a robbery had been committed was contained in petitioner's oral statement, which is nothing more than a brief, affirmative response to one leading question by the police investigator: "What really happened was you pointed a gun at her, at Claudia Cruz, and you took her money and jewelry . . . that's the way it happened?" TM 653. Perkins responded, "Yes, that's the way it happened," TM 653, and provided no further details. That was the extent of his "oral admission of guilt," *People v. Perkins*, 289 A.D.2d at 943. Under these circumstances, to say that the improperly admitted items of evidence were extremely important to the prosecution's case is an understatement. Rather, they formed the bedrock of the prosecution's direct case, and proof upon which the assistant district attorney extensively relied. *See Brown v. Keane*; *Cotto v. Herbert*.

The fourth *Van Arsdall* factor directs me to consider the extent of cross-examination otherwise permitted by the trial court with regard to Cruz. The victim did not testify at all at trial, so there was no cross-examination of her whatever, let alone "effective" cross-examination. *See Cotto v. Herbert*, 331 F.3d at 254 ("[B]ecause the preclusion of cross-examination was complete, the fourth *Van Arsdall* factor–the extent of cross-examination otherwise permitted–weights heavily in favor of the petitioner and highlights the unusual nature of this case."). Moreover, Perkins and trial counsel were excluded from her *in camera* examination at the pre-trial *Sirois*

hearing and therefore the defense could not even cross-examine Cruz there–although it is

doubtful that that would have been sufficient. *Compare with Vasquez v. Jones*, 496 F.3d at 577

("[W]e doubt that the opportunity to question a witness at a preliminary examination hearing

satisfies the pre-*Crawford* understanding of the Confrontation Clause's guarantee of "an

opportunity for effective cross-examination" when the witness does not appear at trial.  In any

event, we agree with the trial court that in light of the voluminous discovery in this case, it would

have been unrealistic to expect defense counsel to be prepared to question Demond Brown about

his criminal record at this early stage. Given this material restriction on the questioning permitted

at the preliminary examination, we conclude that the fourth [*Van Arsdall*] factor points toward a

finding that the error [in excluding  impeachment evidence at trial regarding criminal record of

unavailable prosecution witness, who testified in preliminary hearing that he saw defendant fire a

handgun] was not harmless.") (internal quotation and emphasis removed). Because "preclusion

of cross-examination was complete" here,  I find that this factor weighs entirely in Perkins'

favor.

        Finally, far from being "overwhelming," the evidence of Perkins' guilt regarding the

charge of first degree robbery was fairly weak without the erroneously admitted

evidence–victim's grand jury testimony and out-of-court statements, and petitioner's written

statement. The Court has grave doubts that without the errors, the prosecution would have been

able to secure a guilty verdict–the *properly admitted* evidence against Perkins was that thin. The

accumulated detrimental effects of the multiple constitutional errors committed by the trial court

pervaded the entire criminal trial. The Supreme Court in *O'Neal v. McAninch*, 513 U.S. at 436

(1995), instructed a court assessing harmless error under *Brecht* to ask, "Do I, the judge, think

that the error substantially influenced the jury's decision?" Upon review of the record in its

entirety, I cannot in good faith answer in the negative. For all of the foregoing reasons, I must

conclude that the Confrontation Clause, Fifth Amendment, and Due Process errors in Perkins'

case "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*,

507 U.S. at 623, and therefore were not harmless.

## V.      CONCLUSION

For the foregoing reasons, petitioner Victor Perkins's petition for a writ of habeas corpus

is conditionally granted. Petitioner is ordered released from custody if the State of New York

does not retry him (1) within sixty (60) days of the entry of this judgment, should appeal not be

taken; or (2)  within sixty (60) days of any final opinion on appeal that affirms this decision,

should an appeal be taken by respondent.  If respondent takes an appeal, this judgment is stayed

(and petitioner shall remain incarcerated) until all appellate proceedings are completed and a

final mandate is received by this Court.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      March 10, 2008
            Rochester, New York.